UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
:
    Plaintiff, :
: 11 Civ._____ (   )
        -against- :
:
:
ASSOCIATION FOR BETTERMENT THROUGH :
EDUCATION AND LOVE, INC., and :
ANTHONY O. DEGREGORIO, SR., :
:
        Defendants, :
:
and :
:
MARGHERITA DEGREGORIO, :
:
        Relief Defendant. :
:
------------------------------------------------------------------x

### DECLARATION OF ERIC ELEFANTE IN SUPPORT OF PLAINTIFF'S EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE AND OTHER RELIEF

I, Eric Elefante, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am employed as a staff accountant in the New York Regional Office of Plaintiff Securities and Exchange Commission ("Commission"). My duties are to conduct examinations of registered and unregistered broker-dealers to ensure their compliance with the federal securities laws. In March 2011, I was assigned to assist in an investigation in connection with this action. I submit this Declaration in support of the Commission's emergency application (the "Application") for an Order to Show Cause, Temporary Restraining Order, Preliminary Injunction, Asset Freeze and Other Relief against defendants Association for Betterment through

Education and Love, Inc. ("ABEL") and Anthony O. DeGregorio, Sr. ("DeGregorio") and relief defendant Margherita DeGregorio ("M. DeGregorio").

2. As alleged in the Commission's Complaint, this action concerns ABEL and DeGregorio's issuance of securities in unregistered transactions to investors. As a result of my investigation, I have preliminarily determined the facts set forth herein. The Commission's Complaint is being filed herewith along with this declaration.

3. I make this Declaration based upon personal knowledge, information and belief. The sources of my information and the bases of my belief are documents obtained and reviewed by the Commission staff, interviews of DeGregorio and eight ABEL investors in which I participated, and information provided to me by other members of the Commission staff. The statements of others set forth herein are described in substance and in part, and not verbatim. To the extent that there are assertions herein concerning dates and numbers, they are approximate, based upon information and evidence gathered to date. Because the Commission submits this Declaration for the limited purpose of supporting its Application for a Temporary Restraining Order, Preliminary Injunction, And Other Relief, I have not set forth each and every fact that I know about the investigation.

4. During the staff's investigation, which is ongoing, I have, among other things, (i) participated in interviews of DeGregorio, and observed testimony provided by him; (ii) participated in interviews of eight ABEL investors; (iii) reviewed documents produced to the staff by ABEL, including summaries of its performance, charitable donations, investor lists, and instruments it offered and sold to investors; (iv) reviewed certain bank account and brokerage records for ABEL, DeGregorio, and Margherita DeGregorio, as well as for others, including other entities controlled by DeGregorio; (v) reviewed records provided by certain investors

concerning their investments in ABEL; (vi) reviewed federal tax returns filed by ABEL; and (vii) reviewed correspondence between DeGregorio and the New Jersey Department of Banking and Insurance ("NJDBI") concerning ABEL's issuance of purported Charitable Gift Annuities ("CGAs"). In reviewing these documents, I have determined that since its inception in 1989, ABEL has issued at least $1.3 million in ABEL securities in unregistered transactions to at least 30 investors.

## I.     Relevant Parties

5.     **ABEL** is a New Jersey corporation incorporated by DeGregorio in 1989. A true and correct copy of ABEL's Articles of Incorporation is annexed as Exhibit 1. DeGregorio has controlled ABEL from inception to present, and operates ABEL out of his house in Tinton Falls, New Jersey. ABEL has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.

6.     **DeGregorio**, age 81, is a resident of Tinton Falls, New Jersey. He is a career tax preparer and, up until 2005, a registered representative with series 6, 7 and 24 licenses. In 2005, he was barred by the NASD in connection with a complaint concerning his provision of unsuitable advice to a client. A true and correct copy of the NASD Notice of Acceptance of Letter of Acceptance, Waiver and Consent concerning DeGregorio's bar is annexed as Exhibit 2. He continues to prepare tax returns, including for elderly individuals whom he has served for many years.

7.     **Margherita DeGregorio ("M. DeGregorio")**, age 82, is DeGregorio's wife and resides with him in Tinton Falls, New Jersey. She is listed as a Trustee for an ABEL brokerage account and a signatory on an ABEL bank account, but is not identified as an ABEL trustee or board member in the company's tax filings. As set forth herein, at times, ABEL-related monies

3

have flowed through or between accounts held in the name of M. DeGregorio or jointly held by the DeGregorios. From March to May 2008, a series of discrete transfers between ABEL and M. DeGregorio's accounts resulted in a net benefit to M. DeGregorio of $70,000.

## II.     ABEL's Security Offerings

8.     ABEL's records and records of ABEL's bank accounts indicate that ABEL's primary source of fundraising has been securities sold to family members and clients who have received (or accrued) high rates of return on their investments.

9.     ABEL issued securities in the form of purported charitable gift annuities ("CGAs") and purported "CDs." ABEL has consistently pooled all monies it has received from sales of these investment contracts in the same bank and brokerage accounts. ABEL currently holds bank account no. XXX1039 at EverBank. ABEL currently holds securities brokerage account no. XXX5478 at OptionsHouse. ABEL and DeGregorio also deposited funds received from outright donors and other funds he managed for investors in these accounts.

10.    At least some of the individuals who purchased unregistered securities issued by ABEL do not appear to have sufficient assets or income to qualify as "accredited investors" as defined in the Securities Act of 1933. The staff issued a subpoena calling for production of all documents relating to the securities issued by ABEL. ABEL and DeGregorio did not produce any documentation showing that any of the ABEL investors were accredited. Documents obtained by the staff show that one of the annuitants would not have qualified as an accredited investor in the years immediately prior to and immediately after issuance of the CGA. Annexed as Ex. 3 is a true and correct copy of brokerage firm records reflecting the financial circumstances of an individual who became an ABEL annuitant.

11. ABEL did not produce any prospectus or audited balance sheet to the staff. None of the investors the staff interviewed received a prospectus or an audited balance sheet in connection with ABEL's offering of securities to them. I have seen no evidence that ABEL had its finances audited at any time.

A. **ABEL's Issuance of Charitable Gift Annuities**

12. Until 2007, the primary source of ABEL's funds came from CGAs. ABEL's CGAs were memorialized in 1-page agreements that promised a fixed annual income stream at a rate that DeGregorio stated was determined by the annuitant's age at the time of agreement. CGAs also offered investors a potential tax benefit in the form of a charitable tax deduction.

13. By letter dated November 21, 2005, the New Jersey Department of Banking and Investment ("NJDBI") notified DeGregorio that a permit was required to issue charitable gift annuities and provided DeGregorio with the relevant guidelines and requirements. A true and correct copy of the NJDBI's letter to ABEL is annexed hereto as Exhibit 4. The staff was advised by the NJDBI that ABEL never filed for a permit.

14. In the first three years after incorporation, the only CGA annuitants were DeGregorio and M. DeGregorio. Over the next two decades, ABEL sold CGAs to at least 18 other individuals, most of whom appear to be family members and DeGregorio's tax preparation clients. ABEL raised a total of approximately $327,500 in principal investments by issuing CGAs, $152,500 of which were issued to DeGregorio and his wife. According to the CGA agreements provided to the staff, ABEL promised rates of return ranging from 6.4% to 12.1% on the CGAs.

B. **ABEL's Issuance of "CDs"**

15. Starting in 2007, ABEL shifted to issuing a different type of security, referred to in 1-page agreements with investors as an "ABEL CD." The CDs state an annual rate of return, with interest either accruing or to be paid in monthly or quarterly installments, and are redeemable on thirty days' notice. A true and correct copy of an ABEL CD is annexed hereto as Exhibit 5.[1]

16. An investor told the staff that DeGregorio represented that their principal investments in the CDs (and any interest the investor chose to accrue) would be pooled in ABEL and invested to generate a return, part of which would fund the investor's guaranteed return, with the remainder of any returns to be donated to charity.

17. To date, ABEL has issued at least $1 million in CDs, some of which have been redeemed. Many of the CD purchasers also were DeGregorio's tax clients.

18. The last CD the staff is aware of ABEL having issued, dated December 31, 2010, is expressly guaranteed not only by ABEL but by "the total assets of the Anthony DeGregorio family." A true and correct copy of the December 31, 2010 CD is annexed as Exhibit 6.

19. In at least one instance in which ABEL promised an individual a "CD-type" guaranteed rate of return, the individual, a tax client of DeGregorio, funded his ABEL investment by submitting an "IRA ROLLOVER REQUEST FORM" in the name of ABEL INC. to the established brokerage firm where he then-held his account. A true and correct copy of the IRA Rollover Request Form is annexed as Exhibit 7. There are no corresponding agreements in the records provided by ABEL to the staff governing this arrangement between the investor and

---

[1] The staff has redacted investor identifying information on all ABEL CD agreements annexed hereto.

6

ABEL. The IRS informed the staff that ABEL is not an approved IRS custodian for retirement funds.

20. When issued, each CD provided at least a 6% rate of return. The interest rate offered by ABEL was significantly higher than interest rates on actual bank "CDs" during the time period.

### III. Private Benefits Generated by ABEL's Operations

21. The CGAs that ABEL issued to DeGregorio and his wife M. DeGregorio comprise almost half of the total face value of the entire amount of all CGAs issued by ABEL. After DeGregorio received notice from the NJDBI about ABEL's lack of a permit to issue CGAs, four of the six CGAs that ABEL subsequently issued were in DeGregorio's name. ABEL's financial records provided to and obtained by the staff do not reflect deposits matching the dates and in the amounts of the CGAs that DeGregorio put in his own name. As ABEL CGA annuitants, DeGregorio and his wife M. DeGregorio would have received the same potential tax benefit as any other ABEL annuitant.

22. Other than DeGregorio and M. DeGregorio, the individuals receiving the high returns and potential tax benefits associated with ABEL's securities are primarily DeGregorio's tax preparation clients and family members.

23. According to a summary document purporting to show ABEL's performance over time, after a full 16 years of operation, ABEL had donated $43,549 to charity while paying out $176,493 in interest payments to annuitants. A true and correct copy of ABEL's performance summary for "1990 – 2006," prepared by DeGregorio, is annexed as Exhibit 8. A similar summary document reflecting ABEL's performance through 2010 shows that ABEL donated $143,049 to charity while paying out $301,000 in interest to charitable gift annuitants. A true

7

and correct copy of ABEL's performance summary dated "1990 – 2010," prepared by DeGregorio, is annexed as Exhibit 9. These figures do not include the additional interest payments ABEL has made to CD holders.

24.     ABEL's most recent performance summary reflects a 9.8% average annual investment return since inception. *See* Exhibit 9.

25.     In June 2004, M. DeGregorio deeded the DeGregorio's personal residence to ABEL, pursuant to a life tenancy. A true and correct copy of deed is annexed as Exhibit 10. Five years later, when the DeGregorios refinanced the mortgage on the property, which had remained in their name, ABEL transferred the house back to the DeGregorios for $1. A true and correct copy of a record from a Westlaw database indicating recording of a mortgage in September 2009 is annexed as Exhibit 11; a true and correct copy of the deed transferring the house from ABEL to the DeGregorios is annexed as Exhibit 12.

26.     In March through May 2008, there were a series of transfers of funds between ABEL's brokerage account, no. XXX5748 held at OptionsHouse, and M.DeGregorio's brokerage account, no. XXX1796 held at OptionsHouse, M. DeGregorio's bank account no. XXX4913 held at EverBank, and the joint checking account of DeGregorio and M. DeGregorio, bank account no. XXX1240 held at EverBank. While M. DeGregorio's brokerage account is in her name, DeGregorio had trading authority over the account. These transfers appear to have resulted in a net benefit to M. DeGregorio of $70,000. True and correct copies of relevant portions of ABEL's brokerage records are annexed as Exhibit 13; true and correct copies of relevant portions of M. DeGregorio's bank and brokerage records, and the DeGregorios' joint bank account records, are annexed as Exhibit 14.[2]

---

[2] The staff has redacted account identifying information from the annexed Exhibit.

27. In September 2010, DeGregorio deposited $106,240 of his own money into ABEL's bank account that appears to represent cash from a Prudential annuity. There is no corresponding record in the records provided to the staff by ABEL for a CGA or CD in his name, or for any donation.

### IV. The Current State of ABEL and DeGregorio's Apparent Incapacity

28. By letter dated May 19, 2011, DeGregorio sent the staff a "File Memo" expressing a "conditional decision" to wind down ABEL's affairs and return all "liabilities." A true and correct copy of the letter and "File Memo" are annexed as Exhibit 15. Three days later, one of DeGregorio's children informed the staff by email that her father had suffered two strokes that had impaired his ability to process information. A true and correct copy of the email received by the staff is annexed as Exhibit 16.

29. I have participated in telephone conversations with one of DeGregorio's children, who is identified on ABEL documents as a member of ABEL's board, since the staff learned about DeGregorio's strokes. The board member appeared to be unaware that ABEL had issued CDs in addition to CGAs.

30. As of May 20, 2011, approximately $380,000 of ABEL's assets was invested in options positions, and approximately $1,365 was invested in common stock. Annexed as Ex. 17 is a true and correct copy of the statement of account as of May 20, 2011, for ABEL OptionsHouse account XXX5748. In addition, as of May 23, 2011 ABEL had approximately $265,000 in cash in bank and brokerage accounts.

31. On May 23, 2011, DeGregorio family member and ABEL board member told the staff that he took over managing the options portfolio with the aim of winding down the positions. He also told the staff that he is not a professional money manager.

9

32. M. DeGregorio holds a securities account in her own name that is primarily invested in options. As of May 20, 2011, the value of the account was $268,322.95. Annexed as Ex. 18 is a true and correct copy of the most recent statement of account for M. DeGregorio's OptionsHouse account XXX1796.

33. In my review of ABEL's records and records of ABEL's bank accounts, I have found the records maintained by DeGregorio for ABEL and produced to the staff to be incomplete and inadequate to determine the identity of each investor, the amounts paid to investors, and the amounts owed to investors, among other information. Through my review of ABEL's bank records, I have identified ABEL investors and payments to ABEL that are not recorded in records ABEL produced to the staff. Annexed as Ex. 19 are true and correct copies of ABEL bank records reflecting deposits from individuals unexplained by records provided to staff by ABEL, some of which the staff has already determined represents investor monies.

34. The staff currently lacks sufficient information to account for all funds currently owed to investors. Because some CD holders have redeemed their investment and some annuitants have died, not all of the amounts raised in the offerings represent liabilities to investors.

Executed on June 2, 2011
New York

_____
Eric Elefante